495 F.2d 929
 161 U.S.App.D.C. 349
 TV 9, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Mid-Florida
TelevisionCorporation, Intervenor.
COMINT CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, TV 9, Inc. and
Mid-FloridaTelevision Corporation, Intervenors.
CENTRAL NINE CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, TV 9, Inc. and
Mid-FloridaTelevision Corporation, Intervenors.
FLORIDA HEARTLAND TELEVISION, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, TV 9, Inc. and
Mid-FloridaTelevision Corporation, Intervenors.
 Nos. 72-2049, 72-2051, 72-2057 and 72-2059.
 United States Court of Appeals, District of Columbia Circuit.
 Argued June 12, 1973.
Decided Nov. 6, 1973, Rehearing and Rehearing En Banc Denied
Feb. 28, 1974.
 
 Reed Miller, Washington, D.C., with whom Thomas H. Wall and Alan C. Campbell, Washington, d.C., were on the brief, for appellant in No. 72-2049 and intervenor TV 9, Inc.
 John D. Lane, Washington, D.C., with whom Ramsey L. Woodworth and John W. Lyon, Washington, D.C., were on the brief for appellant in No. 72-2051.
 Thomas M. P. Christensen, Washington, D.C., with whom Edward P. Morgan, Washington, D.C., was on the brief for appellant in No. 72-2057.
 Vincent A. Pepper and Robert J. Buenzle, Washington, D.C., were on the brief for appellant in No. 72-2059.
 R. Michael Senkowski, Counsel, F. C. C. with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F.C.C., were on the brief, for appellee.
 Paul Dobin, Washington, D.C., with whom Joel H. Levy, Washington, D.C., was on the brief, for intervenor Mid-Florida Television Corp.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and ROBINSON, Circuit Judge.
 FAHY, Senior Circuit Judge:
 
 
 1
 For the prior history of the controversy over who is entitled to a construction permit to operate a commercial television station on Channel 9 in Orlando, Florida, now before us again in these consolidated appeals, one may turn to the decisions of this court enumerated in the margin.[1]
 
 
 2
 In 1965 we vacated the Commission's award of the Channel to Mid-Florida Television Corporation, and caused the opening of the proceedings to additional applicants.[2] In complying the Commission temporarily authorized Mid-Florida to continue its operation on the Channel, stating that such operation was to be 'without prejudice to, and constitutes no preference in, any aspect of any proceeding to be held with respect to channel 9 in Orlando, Fla.'[3]
 
 
 3
 Eight applicants filed for permanent authority.[4] Four of the new applicants (Central Nine Corporation, TV 9, Inc., Florida Heartland Television, Inc., and Comint Corporation) also applied for interim authority, the first three of which subsequently withdrew their request for individual interim authority and formed Consolidated Nine, Inc., to apply for such authority. Consolidated Nine, Inc. 'was an open-ended group, with provisions that any applicant for permanent authority could participate with the original incorporators on an equal basis.'[5]
 
 
 4
 On March 29, 1967, the Commission denied the applications of Consolidated Nine and Comint for interim authority. Simultaneously it permitted Mid-Florida to continue interim operation on the Channel pending the award of the construction permit subsequent to the holding of a comparative hearing.[6] On appeal by Comint and Consolidated Nine we vacated the grant of interim authority to Mid-Florida and remanded, retaining jurisdiction pending further proceedings before the Commission.[7] On the remand the Commission, on January 9, 1969, granted interim authority to Consolidated Nine.[8]
 
 
 5
 The controversy then proceeded to a comparative hearing on the applications for the construction permit of TV 9, Inc., Comint Corporation, Central Nine Corporation, Florida Heartland Television, Inc., and Mid-Florida. On January 10, 1972, the Commission granted the application of Mid-Florida 'for a permit to construct a new television broadcast station to operate on Channel 9 at Orlando, Florida.'[9]
 
 
 6
 The principal basis for favoring Mid-Florida was the conclusion that its proposal '. . . offers the best practicable service to the public because of the substantial preference to which it is entitled in the factor of integration of ownership with management,'[10] enhanced by the local residence of Mr. and Mrs. Brechner, the principal stockholders, their civic participation and radio broadcast experience. The Commission stated that in the particular factual circumstances of the case, '. . . We believe that Mid-Florida will render significantly better service to the public than would TV 9 or Comint, given its substantially superior showing in integration of ownership with management and given the unusually good past broadcast record of Brechner'[11] in the prior operation of a radio station, WGAY, Silver Spring, Maryland, and that the diversification disadvantage of Mid-Florida was not of appreciable significance.[12] Moreover, it concluded.
 
 
 7
 Mid-Florida's vastly superior showing regarding the best practicable service affords the greatest assurance that Mid-Florida will demonstrate the most sensitivity to the Orlando area's changing needs as well as the flexibility to change as local needs and interests change.[13]
 
 
 8
 * Appellants advance a number of reasons for setting aside this decision. Among them is the failure of the Commission to give consideration, adverse to Mid-Florida, to the Roth letter and ex parte contacts with a former Commissioner heretofore discussed fully in our opinions in WORZ, Inc. v. F.C.C., 106 U.S.App.D.C. 14, 268 F.2d 889 (1959); and WORZ, Inc. v. F.C.C., 120 U.S.App.D.C. 191, 345 F.2d 85 (1965). We agree with the Commission, however, that these Roth and ex parte matters were not required to be considered by the Commission, for in our last cited case we stated, 'we would agree that, absent any new evidence bearing upon them, the time has come to end litigation about them.'
 
 II
 
 9
 None of the parties disputes that in the comparative proceedings now before us, the Commission, in appraising Mid-Florida's qualifications compared with those of the other four appellant-applicants, could not rely upon evidence attributable to Mid-Florida's long operation on Channel 9 from 1958 to 1969. The reason is that such operation, as we have held, was never pursuant to valid authority. The competing applicants in the present proceedings were to be appraised on a basis of equality irrespective of past operation by Mid-Florida on the Channel. Comint requested the Review Board so to rule prior to the hearing. The request was denied by the Board and the matter left for decision by the Examiner. The result was that a very considerable amount of evidence came into the record respecting Mid-Florida's operation on Channel 9. This evidence is now conceded by all parties to have been inadmissible.
 
 
 10
 Contentions arising from this error must be considered in light of the position of the Commission and Mid-Florida that the inadmissible evidence, and any findings based thereon, were disregarded by the Commission, so that, it is said, the error was harmless. Appellants counter that there was so much of this inadmissible evidence-- it was so pervasive-- that the error cannot be remedied except by a new hearing, freeing the court of the need to cope with an elusive appraisal of possible harmlessness. It is also pointed out that the record was deliberately compiled by Mid-Florida in an erroneous manner in order to gain an advantage. As to this Mid-Florida urges that at the time of the hearing it believed in good faith that it had a right to rely upon its past performance. Its position now, however, is that the Review Board and Commission explicitly disregarded the inadmissible evidence and findings of the Examiner based thereon, as Board and Commission firmly state has been done.
 
 
 11
 The resultant question we think is two-fold. First it is whether such a pervasive commingling of admissible and inadmissible evidence, notwithstanding the disclaimer of Board and Commission of reliance upon the inadmissible, has created a record which is not a basis for decision from the standpoint of enabling the other parties fairly to compose a record supporting their own applications and, in the second place, it is whether the Board and Commission can be held with confidence to have entirely disregarded the inadmissible evidence. It is difficult to decide, but we have concluded that we should accept the unanimous disclaimer of the members of the Commission of reliance upon the inadmissible evidence except as we shall note. The introduction of the evidence we think did not preclude the applicants other than Mid-Florida from fairly composing a record in support of their own respective applications. We are fortified in these conclusions by the limited use made of the past performance evidence, that is, whether it influenced the Commission's position with respect to the standing of the respective applicants on the special comparative issues of ascertainment of community needs and proposed programming. The Commission placed each of the five applicants on an equal plane as to these issues, giving no preference to any applicant, a matter we now consider.
 
 III
 
 12
 The Board agreed with the Examiner in placing on an equal footing all applicants with respect to ascertainment efforts and proposed programming, the 'special issues.'[14] However, the Examiner in reaching his conclusions had considered evidence on Mid-Florida's ascertainment efforts and proposed programming which was related to its past operation on the Channel. The Board held such evidence to be inadmissible and stated:
 
 
 13
 Mid-Florida, as an initial applicant for a new facility, could not introduce any evidence relating to its or its principals' 'experience, performance, or broadcast record' on Channel 9. Thus, for decisional purposes, Mid-Florida never operated a station on Channel 9 at any time. We interpret the terms 'experience, performance or broadcast record' to include the following: the experience of Mid-Florida's principals in operating the station; the ascertainment of community needs and problems by the applicant in its role as station operator, and by its principals and employees when engaged in station operations; the past programming of the station; and the record of the stating in general. We are deleting from the Initial Decision all findings and conclusions on Mid-Florida's ascertainment efforts and proposed programming which relate to Mid-Florida's past operation on Channel 9.[37] . . 37. We are also disregarding all evidence in the record which relates to the past operation of Mid-Florida on Channel 9, no matter when.[15]
 
 
 14
 The Board then concluded: 'Even when we judge Mid-Florida's showing under the special issues without regard to the inadmissible evidence, we must agree with the Examiner's ultimate conclusion.' We part from the Board in this matter.
 
 
 15
 Evidence of Mid-Florida's efforts on the ascertainment issue primarily consisted of the contents and results of two community surveys in 1966 and 1967. The 1966 survey was conducted under the supervision of Mr. Brechner and other station employees during Mid-Florida's operation of the station on the Channel. The other, in 1967, was a survey conducted by Universal Marketing Research, Inc., also during Mic-Florida's operation on the Channel.[16] As to the former, the Board ruled as follows:
 
 
 16
 The January 1966, community leader survey conducted by Mid-Florida failed to elicit any but a few comments on community needs and problems. However, the persons contacted did represent a cross-section of the community . . .. Comint's exceptions to findings on Surveys made by Mid-Florida as operator of Channel 9 are moot in view of our determination to delete all findings related to that prior operation. This also applies to the 1966 and 1967 surveys to the extent that they refer to the prior operation.
 
 
 17
 The 1966 survey, however, was directed principally to determining the preferences and views of those solicited respecting past programming rather than ascertainment of community needs, although a few responses were directed towards the future. The difficulty is that the Board has not specified what information was deleted and what relied upon. Furthermore, if all references to past programming were deleted very little indeed would remain.
 
 
 18
 In any event the 1966 survey we think cannot be relied upon since it falls within the ruling of the Board excluding all surveys which were the result of 'the ascertainment of community needs and problems by (Mid-Florida) in its role as station operator, and by its principals and employees when engaged in station operations . . ..'[17]
 
 
 19
 Similar difficulties exist with respect to the 1967 survey. The purpose of this survey was 'to determine and evaluate public opinion of Channel 9-WFTV.' The persons contacted were questioned about Channel 9 in comparison with other local television stations. Thus the survey was not directed towards the ascertainment of community needs, although it is perhaps true that likes and dislikes of people may have some relevance to community needs. One question, however, was specially directed to ascertainment of community needs:
 
 
 20
 Q. 16. In your opinion what is the most important local or community problem which should be brought to public attention on TV?
 
 
 21
 But the answers to this question were lost,[18] and hence could not be relied on.
 
 
 22
 As to Mid-Florida's program proposal the Board concluded that it was based on Mid-Florida's ascertainment efforts and not its past programming:
 
 
 23
 . . . the Examiner correctly concluded that Mid-Florida's proposed programs are the product of its ascertainment efforts . . .. Mid-Florida's past operation of Channel 9 is not being considered by us in this Decision . . .. Therefore, it would be improper to make conclusions based on Mid-Florida's past programs.[19]
 
 
 24
 Mid-Florida's proposal, however, is almost entirely based upon its prior operation of Channel 9, as the proposal itself states:
 
 
 25
 (Mid-Florida's) program proposals for operation of the station upon grant of its present application are based upon its past experience in operation of Channel 9 and the actual programming broadcast. With exceptions noted below, the station's program schedule for the week of October 24 through October 30, 1966, attached hereto, is illustrative of the kind of programming which will be presented . . ..
 
 
 26
 Even though the Board has held inadmissible all evidence in the record which relates to the past operation of Channel 9 by Mid-Florida with respect to programming,[20] the Board has not specified what remains of Mid-Florida's program proposal and upon what admissible evidence respecting ascertainment it found the proposal to be based.
 
 
 27
 Therefore, with respect to the special issues of ascertainment of community needs and proposed programming, the court can reach no conclusion as to Mid-Florida separate and apart from the inadmissible evidence and the influence of Mid-Florida's past operations on the Channel. The ascertainment and program problems are simply too intertwined with such past operations to enable the court to find a separate basis for approval of the Commission's position that Mid-Florida stands on an equal footing with the other applicants. As a group, therefore, the advantage is with them, though each of the four we agree is on an equal basis with the others. Even if it were possible to find support for an appraisal of Mid-Florida on these special issues, a basis therefor on admissible evidence has not been set forth by the Commission; if the Commission placed no reliance upon Mid-Florida's past performance we are unable to find the evidence which was relied upon. While we have declined to order an entire rehearing of this case due to the concededly inadmissible evidence, and findings of the Examiner based thereon, which the Commission assures us were disregarded, when we come to consideration of these particular issues the relation of past performance on the Channel by Mid-Florida to the conclusion reached by the Commission is too permeating to enable the court fairly to conclude that the Commission was not mistaken in finding an independent basis for its decision.
 
 IV
 
 28
 Comint raises a special matter relevant to its application when compared with all others. The principals of Comint include two local Black residents, Paul C. Perkins, who had a 7.17% Voting stock interest, and James R. Smith, M.D., with a 7% Like interest. Both have lived in the local area, of which about 25% Of the population are Black, for more than 20 years, and have not only been active in advancing the interests of the Black members of the community but also have been primarily responsible for significant achievements in bettering conditions for the Black population.[21] Since the highest interest owned by any of Comint's principals was 10%, their individual as well as combined ownership is substantial. In addition, Mr. Perkins was to assume the office of Vice President and proposed to devote two days a week to the station. He was also a member of the Board of Directors, and a member of both the Editorial and Community Service Committees. Dr. Smith was a Director of the corporation and was to be on at least one Committee, but he did not propose to devote any specific amount of time to the station.
 
 
 29
 No merit was accorded to Comint by reason of this Black ownership and participation, although some credit was given under the criterion of ownership participation in management, due to Mr. Perkins' role in that connection. We outline the Commission's position as reflected by that of the Review Board, accepted by the Commission, quoting the Examiner in part:
 
 
 30
 . . . the 'Communications Act, like the Constitution, is color blind. What the Communications Act demands is service to the public in the programming of the station and that factor alone must control the licensing processes, not the race, color or creed of an applicant.' See Chapman Radio and Television Company, 19 F.C.C.2d 157, 183, 17 RR 2d 60, 94. Comint has not proved by this standard that its programing directed toward the Negro (and white) audience would be superior to Mid-Florida's (to mention it only of the applicants) because two of its stockholders, Mr. Perkins and Dr. Smith, are Negroes. Unless Comint showed that the participation of Mr. Perkins and Dr. Smith in the operation of the station would use their experience, background, and knowledge of the community in a way likely to result in a superior service it cannot prevail on this point. There is nothing in the degree or type of participation proposed by Mr. Perkins and Dr. Smith which gives assurance that the benefits of their racial background would inure in any material degree to the operation of the station . . . it cannot be held, under the Policy Statement, which demands the practical application of attributes through station participation, that their part ownership in Comint implies the rendition of a service for a minority group which other applicants could not provide.[22] Basically, (the Board continued) we agree with the Examiner's conclusions.
 
 
 31
 . . . we believe that, in a comparative broadcast proceeding which is governed by the Commission's Policy Statement . . . Black ownership cannot and should not be an independent comparative factor . . . rather, such ownership must be shown on the record to result in some public interest benefit . . .. As the Examiner held, such a showing is absent here . . .. In our opinion, Black ownership is more analogous to local ownership than to any other existing comparative factor, and local ownership is no longer recognized by the Commission as an independent factor, but is decisionally significant only when reflected in active participation in station affairs.[23]
 
 
 32
 We think this is not an adequate disposition of the subject. To say that the Communications Act, like the Constitution, is color blind, does not fully describe the breadth of the public interest criterion embodied in the Act. Color blindness in the protection of the rights of individuals under the laws does not foreclose consideration of stock ownership by members of a Black minority where the Commission is comparing the qualifications of applicants for broadcasting rights in the Orlando community. The thrust of the public interest opens to the Commission a wise discretion to consider factors which do not find expression in constitutional law. Inconsistency with the Constitution is not to be found in a view of our developing national life which accords merit to Black participation among principals of applicants for television rights. However elusive the public interest may be it has reality. It is a broad concept, to be given realistic content.
 
 
 33
 The Commission's reliance upon its Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965) we think is not accurate. Although, as the Commission states, 'The two primary objectives toward which applicants for television rights. However (1) the best practicable service to the public; and (2) a maximum diffusion of control (of) the media of meas communication,'[24] not only are these objectives not exclusive of other considerations but the Policy Statement itself disavows an intention 'to preclude the full examination of any relevant and substantial factor.'[25] This minority stock ownership of an applicant serving the Orlando community is a consideration relevant to a choice among applicants of broader community representation and practicable service to the public. The credit awarded due to Mr. Perkins' participation, as a part owner, in management is not the same as credit based on broader community representation attributed to his and Dr. Smith's stock ownership and participation.[26] And this broader community representation is not to be ignored because their participation was not to be greater.
 
 
 34
 In passing upon considerations open to the Commission even on an application for renewal of a license this court has taken a stand against heavy reliance upon maintenance of the status quo. We have adverted to recognition by the Supreme Court of the connection between diversity of ownership of the meas media and diversity of ideas and expression required by the First Amendment. Citizens Communications Center v. F.C.C., 145 U.S.App.D.C. 32, 44, n.36, 447 F.2d 1201, 1213, n.36 (1971). In this same note, we said that 'as new interest groups and hitherto silent minorities emerge in our society, they should be given some stake in and chance to broadcast on our radio and television frequencies.' As Commissioner Hooks pointed out in his concurring opinion in the present case,[27] we stated on petition for rehearing in Citizens Communication Center v. F.C.C., supra, even with respect to renewal application:
 
 
 35
 The essence of our opinion is that in cases involving a renewal application the Communications Act and Ashbacker Radio Corp. v. F.C.C., 326 U.S. 327 (66 S.Ct. 148, 90 L.Ed. 108) (1945), require a single full comparative hearing in which all applicants may develop evidence and have their applications judged on all relevant criteria, including plans for integration of minority groups into station operation.
 
 
 36
 149 U.S.App.D.C. 419, 420, 463 F.2d 822, 823 (1972).
 
 
 37
 [ 5] A similar approach applies to the situation respecting Comint growing out of the interests of Mr. Perkins and Dr. Smith. It is consistent with the primary objective of maximum diversification of ownership of mass communications media for the Commission in a comparative license proceeding to afford favorable consideration to an applicant who, not as a mere token, but in good faith as broadening community representation, gives a local minority group media entrepreneurship.[28] As we said in Citizens Communications Center, 'no quota system is being recommended or required.'[29] We hold only that when minority ownership is likely to increase diversty of content, especially of opinion and viewpoint, merit should be awarded.[30] The fact that other applicants propose to present the views of such minority groups in their programming, although relevant, does not offset the fact that it is upon ownership that public policy places primary reliance with respect to diversification of content, and that historically has proven to be significantly influential with respect to editorial comment and the presentation of news.[31]
 
 
 38
 With due respect, therefore, the court does not accept the Commission's position based either on the Policy Statement or lack of advance assurance of superior community service attributable to such Black ownership and participation, an assurance not required, for example, for favorable consideration of local residence, accompanied with participation, on the issue of integration of ownership with management. Reasonable expectation, not advance demonstration, is a basis for merit to be accorded relevant factors.
 
 V
 
 39
 Appellants TV 9, Inc., Central Nine, Florida Heartland, and Comint, prior to release of the Review Board's decision, filed with the Board on November 12, 1971 a joint petition to remand, to reopen the record and to enlarge the issues to determine the effect upon Mid-Florida's basic and comparative qualifications of a federal indictment of November 1, 1971, against Martin Segal. Mr. Segal was then the Secretary, a Director and the General Counsel of Mid-Florida, owning 1.540% Interest in Mid-Florida. He and fifty-eight additional persons were named in the indictment following a task force investigation conducted by the Department of Justice, with overtones of violations of the Organized Crime Act of 1970. The indictment was built around alleged illegal gambling activities, with enumerated overt acts charged in furtherance of the conspiracy, allegedly violative of Title 18 U.S.C. 2 and 1955, as well of State law.
 
 
 40
 The petition to reopen and enlarge the issues states the following respecting Mr. Segal's relationship to Mid-Florida:
 
 
 41
 Mr. Segal has served as General Counsel to Mid-Florida since 1962. (Tr. 1797). In this capacity he advises Mid-Florida on day-to-day legal and other matters. (Id.) In addition, the record shows that Mr. Brechner of Mid-Florida consults him on editorial problems and positions and that Mr. Segal has suggested editorial support for certain political candidates which he favored. (Tr. 1798, 1807-8, 1810.) Mr. Segal also participates in program formulation, having aided in the selection of participants, for example, in the program, 'Moral Issues of Our Times.' (Tr. 1811.) Mr. Segal has committed himself to spend an average of one-half day per week on the affairs of the television station in the event of a grant to Mid-Florida. (Tr. 1800, Initial Decision, par. 168.)
 
 
 42
 Mid-Florida informed the Commission that Mr. Segal had resigned as an officer and director on November 9, 1971, because of his physical condition. It appears that on October 27, 1971, he had been shot and severely wounded by his wife. Subsequently to submission of this case for our decision we are advised the indictment against Mr. Segal has been dismissed due to his physical condition which precludes a trial.
 
 
 43
 Mid-Florida petitioned to amend its application to show the removal of Mr. Segal from involvement in its affairs. The company had adopted a resolution to the effect that until the charges were resolved he would not be involved and would be requested, when able, to sell his stock to the corporation with the right to repurchase should the criminal charges be resolved in his favor. The petition to amend was opposed by appellants since, as they contended, it was designed to enable Mid-Florida to escape demerit due to the situation respecting this officer, citing, inter alia, WORZ, Inc., 36 F.C.C. 1535, at 1543 (1964), and Mid-Florida Television Corp., supra, 33 F.C.C.2d at 13, to the effect that to allow such an amendment in the circumstances would give Mid-Florida a comparative advantage-- i.e., elimination of a disadvantage-- 'which post designation amendments are not permitted to accomplish.'
 
 
 44
 The Review Board-- with Commission approval-- allowed Mid-Florida to amend as requested, to reflect that Mr. Segal was divested of all authority and that Mid-Florida had offered to purchase his interest. The Board and Commission correlatively ruled that since Mr. Segal was no longer associated with the applicant, Mid-Florida was relieved of responsibility for any misconduct on his part, mooting the issue posed by the petition to reopen the record.
 
 
 45
 We think the Commission was not required to deny the requested amendment suspending the continuation of Mr. Segal's participation in Mid-Florida's affairs. We are aware of the diversity of decisions bearing in one way or another on the problem, and we are unable to find in them a clear decisional line. In Fisher Broadcasting Co., 30 F.C.C. 177 (1961) the amendment was allowed, with consequences that the pre-amendment situation was held by the Commission to have become moot. The amendment, however, concerned a change in an ownership interest of a principal and raised no issue with respect to character. In Grayson Television Co., 11 F.C.C.2d 881 (1968), the Commission refused to allow an amendment to reflect the fact that a minority stockholder with an interest in another station had withdrawn. It was thought that to allow the amendment might give the applicant a preference with respect to diversification. And see News Sun Broadcasting Co., 24 F.C.C.2d 770 (1970). In Chapman Radio and Television Co., 26 F.C.C.2d 891, 893 (1970), the Commission denied permission to amend. The petitioning applicant sought to show that a principal, whose conviction of crime was on appeal, had assigned his interest. The Commission refused to allow the applicant's belated attempt to improve in this manner its over-all comparative status. The Commission subsequently held:
 
 
 46
 Violation of federal law, either by an applicant or one of its principals, on its face, raises a sufficient question regarding character to merit careful examination in order to determine whether an applicant is qualified to operate a broadcast station in the public interest.
 
 
 47
 38 F.C.C.2d 871 (1973).
 
 
 48
 We think our duty is clear. We note first the fact that Mr. Segal's active connection with Mid-Florida has been suspended, and we assume is perhaps ended, regardless of the fate of the petition to amend. Moreover, the facts which gave rise to that petition occurred after the Mid-Florida application was filed. For these reasons we do not disturb the Commission's grant of the petition to amend. We disagree, however, that permitting the amendment mooted the significance of the facts which gave rise to it with respect to the applicant's character, or mooted any other consideration relevant to the matter.[32] Those facts called upon the Commission to grant the petition of appellants to reopen the hearing for a thorough inquiry into the character qualifications of Mid-Florida growing out of the association of Mr. Segal as a participating principal of the applicant when he was its part owner, a director, an officer and its General Counsel. A determination by the Commission with respect to this matter does not depend upon the outcome of a trial on an indictment, which we are now advised is beyond the possibilities because of Mr. Segal's physical condition. Proof of guilt of crime is required to be established to the satisfaction of the fact-finder beyond a reasonable doubt. Even a verdict of not guilty under this standard, though relevant, is not decisive of the character qualifications of an applicant under the standard of public interest relevant to comparative broadcasting responsibility among several applicants under the Communications Act. Furthermore, the presumption of innocence which accompanies one charged but not convicted of crime is not a bar to consideration of the charges in this civil proceeding under the standard of the public interest.
 
 
 49
 Further inquiry into the matter must be conducted with careful and sympathetic regard for Mr. Segal's physical condition, but with this qualification matters of this sort cannot simply be passed over even though Mr. Segal's association with Mid-Florida is suspended or discontinued. The character qualification of Mid-Florida, in and of itself and comparatively, remains for inquiry and decision as it may be reasonably affected by the circumstances surrounding the bringing of the criminal charges against Mr. Segal.
 
 VI
 Two further matters need attention:
 
 50
 1. In awarding a preference to Mid-Florida by reason of the nature of its integration of ownership with management, the Commission relied in significant part upon the civil participation of Mr. and Mrs. Brechner. The record indicates that the Commission's appraisal of their civic activities might have included activities related to Mid-Florida's past performance. On the remand the appraisal must be made without reliance upon inadmissible evidence, the avoidance of such reliance to be demonstrated so as to be subject to intelligent review. We attach importance to this, for although we do not now disturb the preference accorded Mid-Florida over TV 9 under the criterion of integration of ownership with management, we think the issue is closer than the Commission indicates. Its analysis of the subject does not persuade the court of the 'substantial' character of Mid-Florida's preference over TV 9 in this regard.
 
 
 51
 2. Should the Commission in the exercise of a sound discretion reopen the record, otherwise than in respect to the Segal matter, it shall be reopened for all applicants in the respects in which it is thus reopened.
 
 
 52
 The grant to Mid-Florida is set aside and the case is remanded to the Commission for further proceedings not inconsistent with this opinion. Notwithstanding the protracted time involved already, and our reluctance to extent it, the court must place above such reluctance the need for an end result which meets its approval when called upon to review the action taken, under the standards applicable to our review authority.
 
 
 53
 It is so ordered.
 
 SUPPLEMENTAL OPINION
 FAHY, Senior Circuit Judge:
 
 54
 The Commission has suggested that the case be reheard en banc. In part the suggestion is directed to the court's position with respect to what the Commission has referred to as the 'Black ownership' phase of the case. Several contentions and misunderstandings of the Commission made in its suggestion for rehearing en banc lead to this Supplemental Opinion.
 
 
 55
 * It is said that the court erroneously has held that merit should be accorded Comint due only to the Black ownership of some of its stock. This is not the position of the court in this case. The court rests its position upon both the stock ownership of Dr. Smith and Mr. Perkins and their participation in station affairs.[33] See the concluding paragraph of Part IV of the court's opinion.
 
 II
 
 56
 The Commission mistakently refers to the court's holding as directing the Commission to adopt a 'new comparative policy of awarding preferences for Black or minority ownership, per se.' Not only has the court not relied solely upon minority ownership, but our opinion makes no mention of a preference in this matter.[34] In determining which applicant is entitled to a preference under the standard of public interest residing in broader community representation and practicable service to the public by increasing diversity of content, especially of opinion and viewpoint, the court holds only that Comint was entitled to be accorded merit due to the ownership and participation of Dr. Smith and Mr. Perkins. A preference did not necessarily follow since competing applicants were not foreclosed from seeking similar or greater merit.[35]
 
 III
 
 57
 The position of the Commission is that the comparative standing of an applicant due to personal attributes of an individual stockholder is not enhanced unless the stockholder demonstrates an intent 'to devote significant time to station management in a meaningful capacity.' While no doubt sound as a general policy statement, this position does not preclude that of the court in this case. The Policy Statement upon which the Commission relies is not an absolute. It expressly allows 'the full examination of any relevant and substantial factor,' thus recognizing that the Act itself, and not the Policy Statement, is the Commission's basic charter. Moreover, the court in this case has made no casual departure from the Policy Statement, but a reasonable interpretation of its thrust in light of the basic public interest to be served. Mr. Perkins and Dr. Smith have substantial stock in Comint. The substantial participation expected of Mr. Perkins is well established. While the participation of Dr. Smith is not specified in like detail, the record demonstrates that he as well as Mr. Perkins has been outstanding in seeking to better the conditions of the Black minority representing 25% Of the Orlando community. The findings of the Review Board are most impressive as to his life and work. In carrying their civic interests now into this new association it is only reasonable to hold that the combined participation of these two men will promote genuine and meaningful diversity of programming and thereby serve the public interest. We do not take issue with the reasonableness of the agency's general approach that station performance will be determined by persons in 'managerial' positions. However, in view of the nature of the issues in this case, and the probability that Black persons having substantial identification with minority rights will be able to translate their positions, though not technically 'managerial,' and their ownership stake, into meaningful effect on this aspect of station programming, we think that such material factors residing in the evidence cannot reasonably be totally and rigidly excluded from favorabe consideration.
 
 
 58
 The petition for rehearing of intervenor, Mid-Florida Television Corporation, is denied, and we note that the petition for rehearing en banc of appellee, Federal Communications Commission, has also been denied.
 
 
 59
 Statement of Circuit Judges MacKINNON, ROBB and TAMM, as to the reasons why they would grant the motion for rehearing en banc.
 
 
 60
 With all respect to the ends which the majority has in mind, it is respectfully submitted that the means they have adopted are constitutionally suspect. The panel concedes that a 'preference' cannot be given because of race and so the opinion permits race to be considered as a 'merit' in the FCC's evaluation of license applications. There is no substantial difference between the two statements, both are discriminatory and it is submitted impermissible. We vote for rehearing en banc.
 
 
 61
 Statement of Circuit Judge WILKEY as to the reasons why he would grant the motion for rehearing en banc.
 
 
 62
 With all due respect to the ends which my distinguished colleagues obviously have in mind, I respectfully submit that the means they have adopted are constitutionally suspect. The panel's opinion on motion for rehearing stressed that the factor of race is not to give rise to a 'preference,' but it is to be considered as a 'merit' in the FCC's evaluation of license applicants.
 
 
 63
 Semantics aside, the reason why race is an impermissible factor is logically obvious. Race, sex, national origin have been ruled out as factors on which to predicate any government action because they are factors which the individual is powerless to change. Religion as a factor is also outlawed, not because it cannot be changed, but because we consider it too vital and important to require a man to change it to gain governmental favor.
 
 
 64
 I think this country and its courts long ago reached the conclusion that race could not be a merit or demerit, and that any decision based on race as a factor was constitutionally wrong, morally wrong, and dangerous. There is no way by which a white, yellow, or red man can achieve the same 'merit' point awarded the black man here. This is, as I understand the word, discrimination.
 
 
 
 [1]
 WORZ, Inc. v. F.C.C., 103 U.S.App.D.C. 195, 257 F.2d 199, vacated, 358 U.S. 55, 79 S.Ct. 114, 3 L.Ed.2d 48 (1958), on remand, WORZ, Inc. v. F.C.C., 106 U.S.App.D.C. 14, 268 F.2d 889 (1959); WORZ, Inc. v. F.C.C., 116 U.S.App.D.C. 316, 323 F.2d 618 (1963), cert. denied, 376 U.S. 914, 84 S.Ct. 664, 11 L.Ed.2d 611 (1964); WORZ, Inc. v. F.C.C., 120 U.S.App.D.C. 191, 345 F.2d 85, cert. denied, 382 U.S. 893, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); and Consolidated Nine, Inc. v. F.C.C., 131 U.S.App.D.C. 179, 403 F.2d 585 (1968)
 
 
 [2]
 WORZ, Inc. v. F.C.C., supra, 120 U.S.App.D.C. at 192, 345 F.2d at 86
 
 
 [3]
 WORZ, Inc., 1 F.C.C.2d 1377, 1378 (1965)
 
 
 [4]
 The eight applicants were: (1) Mid-Florida Television, Corp., (2) Orange Nine, Inc., (3) Central Nine Corp., (4) Howard S. Weiss, (5) Florida Heartland Television, Inc., (6) Comint Corp., (7) Florida 9 Broadcasting Co., and (8) TV 9, Inc. See, Consolidated Nine, Inc., 7 F.C.C.2d 801, n. 2 (1967)
 
 
 [5]
 Consolidated Nine, Inc. v. F.C.C., supra, 131 U.S.App.D.C. at 181-182, 403 F.2d at 587-588
 
 
 [6]
 Consolidated Nine, Inc., 7 F.C.C.2d 801 (1967)
 
 
 [7]
 Consolidated Nine, Inc. v. F.C.C., supra, 131 U.S.App.D.C. at 189, 403 F.2d at 595
 
 
 [8]
 Consolidated Nine, Inc., 15 F.C.C.2d 825, 827 (1969)
 
 
 [9]
 Mid-Florida Television Corp., 33 F.C.C.2d 1, 22 (1972), a decision by the Review Board, review of which by the Commission was denied, 37 F.C.C.2d 559 (1972). There was a condition to the grant, not in controversy, that 'prior to licensing, the permittee shall submit acceptable data for type-acceptance of its transmitter in accordance with the requirements of Section 73.640 of the Commission's Rules.' 33 F.C.C.2d at 22
 
 
 [10]
 33 F.C.C.2d at 21
 
 
 [11]
 Id
 
 
 [12]
 In this connection the Commission stated:
 . . . the diversification disadvantage of Mid-Florida is not of appreciable significance inasmuch as the other media are owned by a minority stockholder who will not be actively involved in the operation of the Orlando television station; are not located in Orlando or the proposed service area; are widely separated geographically from Orlando; and have not been shown to be significant in terms of regional coverage in the area where they are situated. A grant to Mid-Florida, under these circumstances, will have no appreciable effect on the basic objective of the diversification policy which is to assure the maximum diffusion and prevent the concentration of control of the sources of news and opinion.
 
 
 [33]
 F.C.C.2d at 21-22
 
 
 [13]
 Id. at 22
 
 
 [14]
 Mid-Florida Television Corp., supra, 33 F.C.C.2d at 15
 
 
 [15]
 Id. at 6 and 15
 
 
 [16]
 Mid-Florida had introduced six additional surveys. Mid-Florida Television Corp., 33 F.C.C.2d 34, at 89-90 (1970) (hereinafter, Initial Decision). However, neither the Examiner nor the Board relied on these surveys in drawing their conclusions respecting the issue of ascertainment
 
 
 [17]
 Mid-Florida Television Corp., supra, 33 F.C.C.2d at 6
 
 
 [18]
 Initial Decision, supra, 33 F.C.C.2d at 265, n. 133
 
 
 [19]
 Mid-Florida Television Corp., supra, 33 F.C.C.2d at 26 (ruling on Exception 82 of TV 9, Inc.)
 
 
 [20]
 See text, supra, at pp. 933-934
 
 
 [21]
 Initial Decision, supra, 33 F.C.C.2d at 156-159, and 163-166
 
 
 [22]
 Initial Decision, supra, at 268
 
 
 [23]
 Mid-Florida Television Corp., supra, 33 F.C.C.2d at 17-18
 
 
 [24]
 Mid-Florida Television Corp., supra, 33 F.C.C.2d at 9
 
 
 [25]
 Policy Statement, supra, at 399
 
 
 [26]
 What the Commission seems to have enunciated as preferable under the criterion of integration of ownership is management control by principals who will be representative of the local community and responsive to its needs. Policy Statement, supra, at 395-396. The fact that members of a local minority group which otherwise is not represented in the ownership of mass communications media in the Orlando area, Initial Decision, supra, 33 F.C.C.2d at 169, are participating principals is relevant to considerations of ownership representation of the local community and it is consistent with the objective of the best practicable broadcast service to the community
 
 
 [27]
 Mid-Florida Television Corp., supra, 37 F.C.C.2d at 563
 
 
 [28]
 The Examiner found that Blacks did not participate in the ownership or management of any mass communications media in the Orlando area. Initial Decision, supra, 33 F.C.C.2d at 169. Also, the United States Commission on Civil Rights, Federal Civil Rights Enforcement Effort, at 280 (1971) states that 'of the approximate 7,500 radio stations throughout the country, only 10 are owned by minorities. Of the more than 1,000 television stations, none is owned by minorities.' This figure may be slightly higher in 1973. See 37 F.C.C.2d 563, n. 17
 
 
 [29]
 Citizens Communications Center v. F.C.C., 145 U.S.App.D.C. 32, 44-45, n. 36, 447 F.2d 1201, 1213-1214, n. 36 (1971)
 
 
 [30]
 Policy Statement, supra, at 394 and n. 4. Also, the Commission elsewhere stated, 'Simply stated, the fundamental purpose of this facet of the multiple ownership rules is to promote diversification of ownership in order to maximize diversification of program and service viewpoints as well as to prevent any undue concentration of economic power contrary to the public interest.' Rules and Regulations Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, 18 F.C.C. 288, 291 (1953); accord, Rules and Regulations Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, 22 F.C.C.2d 306, 310 (1970)
 
 
 [31]
 See generally, Note, Media and the First Amendment in a Free Society, 60 Geo.L.J. 871, 896 and 1006 (1972)
 
 
 [32]
 See Independent Broadcasting Co. v. F.C.C., 89 U.S.App.D.C. 396, 193 F.2d 900 (1951), cert. denied, 344 U.S. 837, 73 S.Ct. 14, 97 L.Ed. 652 (1952); cf., Wrather-Alvarez Broadcasting, inc. v. F.C.C., 101 U.S.App.D.C. 324, 328-329, 248 F.2d 646, 650-651 (1957); Community Broadcasting Corp. v. F.C.C., 124 U.S.App.D.C. 230, 231-232, n. 1, 363 F.2d 717, 718-719, n. 1 (1966), a case not very dissimilar to the present one in principle. But see WEBR, Inc. v. F.C.C., 136 U.S.App.D.C. 316, 325-326, 420 F.2d 158, 167-168 (1969), where we upheld the award of a comparative demerit respecting character. The applicant in good faith had relied on counsel to notify the Commission of a substitution on minority ownership. Though counsel was not a principal his negligence was imputed to the applicant. See also, WORZ, Inc. v. F.C.C., supra, 116 U.S.App.D.C. at 317-318, 323 F.2d at 619-620, a part of the history of the present case in which this court disagreed with a majority of the Commission on the question whether the Roth incident should be considered in assessing the character of Mid-Florida, notwithstanding his death, a situation difficult to distinguish from that now considered
 
 
 [33]
 What consideration might be given to ownership of stock alone is not before the court. Nor need we consider whether primary reliance is properly assigned to ownership or participation, for in this case there is a meaningful combination
 
 
 [34]
 We use 'preference' to mean a decision by the Commission that the qualifications of a particular applicant in a comparative hearing are superior to those of another applicant with respect to one or more of the issues upon which the grant of a permit or license turns
 'Merit' or 'favorable consideration' is a recognition by the Commission that a particular applicant has demonstrated certain positive qualities which may but do not necessarily result in a preference. 'Merit,' therefore, is not a 'preference' but a plus-factor weighed along with all other relevant factors in determining which applicant is to be awarded a preference.
 
 
 [35]
 With respect to a preference, our opinion does not hold that a competing applicant, without any minority group representation in ownership or management, could not have proved that it could better have served the public interest in promoting diversification of opinion and viewpoint in the respects with which the court is concerned in this case, and by so doing to have gained a preference over Comint. In reaching such a conclusion, however, the Commission in our view would have been required to give merit to Comint in the weighing process which led to the preference awarded to the competitor. Under the position taken by the Commission, however, no merit could be accorded Comint in the weighing process