Jane Cheryl ROSENSTOCK, Plaintiff,

v.

The BOARD OF GOVERNORS OF the UNIVERSITY OF NORTH CAROLINA et al., Defendants.

No. C–75–483–D.

United States District Court,
M. D. North Carolina,
Durham Division.

Dec. 17, 1976.

Lawrence A. Young and Michael B. Brough, Chapel Hill, N. C., for plaintiff.

Elizabeth C. Bunting and Andrew A. Vanore, Jr., Staff Attys., North Carolina Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM ORDER

HIRAM H. WARD, District Judge.

The plaintiff, Jane Cheryl Rosenstock, an applicant for admission to the 1975–76 freshmen class of the University of North Carolina at Chapel Hill, initiated this action by filing a complaint on November 14, 1975. Her attack alleges violation of 42 U.S.C. § 1983 in the denial of her application for admission. The matter is before the Court upon the defendants' motion for summary judgment. For the reasons hereinafter stated, the defendants' motion will be allowed.

The plaintiff is a resident of Ellenville, New York, and is nineteen years old. The defendants are the Board of Governors of the University of North Carolina; William C. Friday, President of the University of North Carolina; the Board of Trustees of the University of North Carolina at Chapel Hill, which is one of the sixteen constituent institutions of the University of North Carolina; Ferebee Taylor, Chancellor of the University of North Carolina at Chapel Hill; Richard Cashwell, the Director of Undergraduate Admissions at the University of North Carolina at Chapel Hill; and the Committee on Undergraduate Admissions of the University of North Carolina at Chapel Hill.

In her complaint plaintiff contends that the more stringent standards applicable to out-of-state residents seeking admission to the University of North Carolina at Chapel Hill and the alleged preferential treatment given to applicants who are children of alumni, foreign students, graduate students and athletes, as well as applicants to schools which serve a regional purpose and to a program for students from minority/poverty background deny her the equal protection of the law and due process, and violates the privileges and immunities clause of Article Four, Section Two of the Constitution of the United States. Plaintiff seeks injunctive relief and a declaratory judgment striking down the present admission policies. She asks that she be granted immediate admission to the University.

On April 16, 1976, defendants filed a Motion for Summary Judgment, accompanied by five affidavits, with attached exhibits. On July 30, 1976, plaintiff filed a response to defendants' motion but did not tender

counter affidavits. In plaintiff's response she narrowed the issues for determination to the following:

1. Does defendants' policy of preferential admissions with respect to minority applicants violate plaintiff's right to equal protection of the laws?

2. Does defendants' policy of preferential treatment of in-state applicants for admission violate the privileges and immunities clause of Article Four, Section Two of the Constitution of the United States?[1]

3. Does defendants' policy of preferential treatment of out-of-state applicants who are the sons or daughters of alumni constitute a denial of plaintiff's right to equal protection of the laws?

### Factual Background

#### I. The Institution

The University of North Carolina at Chapel Hill (UNC) is a state-supported institution and a constituent part of the University of North Carolina. It is supported in large measure by the taxpaying residents of North Carolina. In the fiscal year 1974–75, the sum of $61,520,823.03 was appropriated to UNC by the General Assembly of North Carolina from the General Fund of the State. During the five fiscal years, 1970–75, the average appropriation per year has been $46,794,662.75. Over the last five fiscal years, the appropriation to UNC by the General Assembly represents 41.77% of its total funding. These annual appropriations by the Legislature are by far the largest source of funding for the school. Affidavit of Clairborne S. Jones, Attachment 1.

Another source of funds is the alumni of UNC. For 1974–75, in-state alumni contributed a total of $178,144.51 and out-of-state a total $144,420.74. On a percentage basis, the alumni who reside in the State gave 55.2% of the total contributed by alumni while those who resided elsewhere gave 44.8% of the total. Over the last five years, the average per year in-state alumni

gift was $175,107.40 or 54.7% of the total. The out-of-state alumni contribution averaged $144,832.33 or 45.3% of the total. These figures show that there is only a small difference in the amount given by alumni residing in North Carolina and that given by alumni living out-of-state. Affidavit of Clairborne S. Jones, Attachment 2.

#### II. The Admissions Process at the University of North Carolina at Chapel Hill

The process utilized in examining applications for admission begins with an estimate by University officials of the number of applications that will be received. Numerical data from previous years form the basic source of this estimate. This information is then mapped upon a quota limitation which differentiates between in-state and out-of-state applicants. The quota breakdown is basically this: 85% of the freshmen class is to be composed of resident North Carolinians; 15% is to be composed of students from outside of North Carolina. Race, sex, alienage, and national origin are not criteria involved in setting the quota. Second Affidavit of Richard Cashwell; Affidavit of Carolyn Bishop; Affidavit and accompanying attachments of John P. Kennedy, Jr. The quota is a policy of the Board of Trustees of UNC (and its predecessor) and the purpose behind it may be stated as follows: Because the University is a State institution, created for and supported by the bona fide residents of North Carolina, in-state students should be insured a place at the State school insofar as possible. Second Affidavit of Richard Cashwell; Affidavit and accompanying attachments of John P. Kennedy, Jr.

Using this quota differentiation, University officials make an estimate of the number of in-state and out-of-state students who will be accepted for admission. After the number of possible enrollees is determined, an estimate of potential academic success is made. This estimate is derived from statistics indicating the number and

---

1. At oral argument, the plaintiff also argued that the 15% quota on out-of-state applicants violates the equal protection clause of the fourteenth amendment.

quality of applicants for previous years. Affidavit of Carolyn Bishop.

Using the quota does result in different treatment of residents and nonresidents with respect to the level of academic achievement necessary for admission. The difference in treatment of residents and nonresidents for admission purposes flows, not from a set policy of making an academic distinction between the two groups, but from the level of the number of applicants in each group. Since 85% of the places are reserved for North Carolinians, applicants from a broad spectrum of academic success may be admitted. In the case of nonresidents who may make up only 15% of the class, the level of required academic excellence is naturally raised. In other words, the sheer number of applicants per spaces is the determining factor; the fewer the number of spaces available the higher the academic level required. For this reason, the requirements for admission as an out-of-state student are naturally stiffer than those for the resident North Carolinian.

There are certain exceptions to the higher academic requirements necessary for admission of a nonresident. One exception that plaintiff specifically attacks is for the group of children of out-of-state alumni of the University. These applicants must meet the same requirements necessary for admission as resident North Carolinians. The University's reason for this exception is that the alumni, through their support of the University, have contributed substantially to its well-being. In return for their support the University admits their children under the less stringent requirements for resident student admission.

The tangible support given by out-of-state alumni consists of monetary contributions. Because of these gifts certain scholarships, research projects, and capital improvements can be funded and made available to the University, its students and faculty. Further, the University believes there are intangible benefits to be gained from admission of children of out-of-state alumni. These students may already possess a certain allegiance to the University and their early support for University programs may prove a good influence on other students as well. See Brief for Defendants at 18.

Apart from the regular admissions process, the University has established a program for enrollment of students who, because of low socio-economic backgrounds, have not performed well in the traditional areas used to gauge academic success. Instead of placing heavy consideration on past academic achievement, this program seems to attract students who, despite low scores, demonstrate that they have the ability to complete the University's academic program. Many students in this program of experimental admission are members of minority groups. Other than this socio-economic minority distinction, the admissions process of the University does not directly distinguish between students on account of their race, color, sex, national origin or religion. Second Affidavit of Richard Cashwell.

### III. Plaintiff's Application for Admission to the University of North Carolina at Chapel Hill

On or about December 11, 1974, the University received an application for admission from plaintiff. Additional test scores were received in February and on March 5, 1975, plaintiff was notified by the University that her application was complete.

On March 27, 1975, University officials in the Admissions Office reviewed plaintiff's application. Her Scholastic Aptitude Test (SAT) score for the eleventh grade was 440 verbal and 410 math for a combined score of 850 out of a possible 1600 points. In the twelfth grade plaintiff scored 390 on verbal and 460 on math, again for a total of 850 out of 1600 points.[2] These scores were well below both the projected academic requirements for out-of-state admission and also the records of other out-of-state applicants who had been admitted. First Affidavit of Richard Cashwell.

2. Plaintiff, however, alleges that her SAT scores were 440 verbal and 420 math.

According to the Director of Admissions for the University, the plaintiff's grades were good, but her selection of courses in the high school curriculum was not demanding academically when compared to other out-of-state applicants under consideration. Further, her credits in math were deficient for she lacked a course *required* for admission. Plaintiff's overall record did not then have the strength necessary for admission and she was rejected as an out-of-state applicant. First Affidavit of Richard Cashwell.

### Discussion

It is clear both from the nature of the facts involved and the status of the defendants' unrebutted affidavits that there is no genuine issue as to any of the material facts. The admissions process at UNC and the reasons and policies behind the process and the facts of plaintiff's application for admission and subsequent rejection are established and have not been contested. Plaintiff's challenge runs to the constitutionality of the admissions process and her rejection for admission.

■ When considering an equal protection clause allegation, the first question is whether the classification in issue involves suspect criteria or fundamental interests. If so, the appropriate rule for determination of the claim is the compelling state interest test. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). If neither of these two criteria is involved, the appropriate guide for scrutinizing the classification is the rational basis test. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed. 2d 16 (1973); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

### I. Preferential Treatment of Minorities

The first of plaintiff's three challenges concerns the experimental admissions program for minority/poverty applicants. The Court notes at the outset that this is not a policy designed to differentiate solely between applicants of different races. While membership in a minority race may be a characteristic of many applicants in this group, the thrust of the purpose of the program is an adjustment of the normal admissions process for students of low socio-economic backgrounds.

■ There is no question that race is a suspect class. *See, e. g., Loving v. Virginia, supra; McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). The United States Supreme Court has not had the occasion to specifically apply the strict scrutiny test in the context of a reverse discrimination claim. The Court was able to avoid the issue in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), where it was held that the case was moot since the plaintiff was in his final quarter of law school.[3] This Court is not unmindful of the California Supreme Court's decision in *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), where preferential admissions programs for minorities were struck down as a violation of the equal protection clause. The Court understands, however, that the decision in *Bakke* was stayed by the United States Supreme Court on November 15, 1976, pending the filing of a petition for a writ of certiorari. —— U.S. ——, 97 S.Ct. 373, 50 L.Ed.2d 321. The Court, therefore, is not assured of *Bakke's* validity.

In any event the Court is of the opinion that since the experimental admissions program carried on by UNC seeks to include, rather than isolate, students of different races, the policy is not unconstitutional and does not offend the equal protection clause. *See Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Other courts in our federal judiciary have approved race conscious policies in other factual situations where the intent of the policy was to provide opportunity for certain

---

**3.** At oral argument, counsel for the plaintiff here indicated that she was currently enrolled in the undergraduate school at the University of Maryland.

minority groups rather than to deprive benefits. In discriminatory employment cases the courts generally have approved racial preferences as a means of remedying prior discriminatory practices. *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir. 1974); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972). *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The Second Circuit also has recognized that racial classifications are permissible where such is done to achieve equality rather than to create inequality. In the context of holding that a complaint, alleging denial of equal protection because blacks were not relocated after urban renewal, was improperly dismissed; the court in *Norwalk Core v. Norwalk Redevelopment Agency*, 395 F.2d 920, 931–32 (2d Cir. 1968), noted:

> What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required.

Likewise in the area of school desegregation, the Supreme Court has approved the use of racial quotas as a starting point to insure a unitary school system. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). *See also North Carolina Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971). A similar remedy for broadcast licensing may be found in *TV 9, Inc. v. FCC*, 161 U.S.App.D.C. 349, 495 F.2d 929 (1973).

■ The Court finds these cases and the inferences from their respective holdings persuasive. The admissions program attacked by the plaintiff does not violate the equal protection clause because the racial distinctions present in that program are used to extend, rather than to deny, benefits and is, therefore, not subject to the strict scrutiny test. The Court further finds that the program meets the rational basis test since it extends benefits to minority groups and since the State has a legitimate interest in educating *all* of its citizens.

## II. *The 15% Quota; Preferential Treatment of In-State Applicants and Out-of-State Alumni Children*

The second attack is directed at the quota limitation on the number of out-of-state applicants to be accepted for the entering class. Plaintiff contends that this system of selection, as well as the preferential treatment of in-state applicants and out-of-state applicants who are children of alumni, violates both the equal protection clause and the privileges and immunities clause of the Constitution.

■ Plaintiff does not contend and the Court has not found that the quota system at the University involves either suspect criteria or fundamental interests. The right to a University education is not such an interest. *San Antonio Independent School District v. Rodriguez, supra.* Judging the classification under the rational basis test, the Court believes the State has shown reasonable grounds for the differentiation between in-state and out-of-state applicants. The University of North Carolina at Chapel Hill is a state institution of higher education created for the citizens of the State. Of equal importance is the fact that the University is continuously and substantially supported by the citizens of the State through the taxes they pay. For these reasons, the granting of a preference in admission to citizens of North Carolina is a reasonable decision by the State. In *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Supreme Court explicitly recognized that a state has a legitimate interest in providing that the residents have an opportunity to attend a state institution on a preferential tuition basis. Similarly, in *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), the Supreme Court affirmed without opinion, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), a

holding that a one-year domiciliary requirement for residency tuition purposes was not arbitrary, served a legitimate state interest, and did not violate the equal protection clause. For other cases upholding residency requirements for in-state tuition purposes see *Hooban v. Boling,* 503 F.2d 648 (6th Cir. 1974); *Montgomery v. Douglas,* 388 F.Supp. 1139 (D.Colo.), *aff'd,* 422 U.S. 1030, 95 S.Ct. 2645, 45 L.Ed.2d 687 (1975); *Sturgis v. State of Washington,* 368 F.Supp. 38 (W.D. Wash.), *aff'd,* 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973); *Weaver v. Kelton,* 357 F.Supp. 1106 (E.D.Tex.1973). The Court finds the reasoning of these cases persuasive where the preference is, as here, on an admission basis. The quota system used by the University is not constitutionally defective on equal protection grounds.

Nor does the Court find a violation of the privileges and immunities clause. The privilege of attending a state institution on a preferential basis is one the State may grant solely to its own citizens without running aground on this clause. This is not the type of regulation which places citizens of other states in a condition of alienage or the type of right common to the people of the United States. *Blake v. McClung,* 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1898). The privilege and immunities clause is not violated by the preferential admission policy.

Plaintiff also attacks the policy of the University whereby children of out-of-state alumni are exempted from the stiffer academic requirements necessary for out-of-state admission. Again, since no suspect criteria or fundamental interests are involved, the State need only show a rational basis for the distinction. In unrebutted affidavits, defendants showed that the alumni provide monetary support for the University and that out-of-state alumni contribute close to one-half of the total given. To grant children of this latter group a preference then is a reasonable basis and is not constitutionally defective. Plaintiff's attack on this policy is, therefore, rejected.

The questions raised here are, in large part, attacks on administrative decision-making, an area where the federal courts have not and should not heavily tread. Plaintiff has not shown a constitutional reason for abandoning this judicial policy.

In accordance with the foregoing, it is ORDERED that the motion of the defendants for summary judgment be, and the same hereby is, ALLOWED. A judgment shall be entered accordingly.