**WEST MICHIGAN BROADCASTING COMPANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**Waters Broadcasting Corporation, National Association of Black Owned Broadcasters, et al., Intervenors.**

No. 82–2513.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1983.

Decided May 25, 1984.

As Amended June 13, 1984.

---

Eric L. Bernthal, Washington, D.C., with whom Daniel F. Van Horn, Washington, D.C., was on the brief, for appellant.

David Silberman, Atty., F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

David H. Rozzelle, Washington, D.C., with whom Vincent J. Curtis and Patricia A. Mahoney, Washington, D.C., were on the brief, for intervenor Waters Broadcasting Co.

James L. Winston, Walter E. Diercks, J. Clay Smith, and Frederick D. Cooke, Jr., Washington, D.C., were on the joint brief for intervenors Nat. Ass'n of Black Owned Broadcasters, et al.

Allen S. Hammond, IV, and Andrew Jay Schwartzman, Washington, D.C., were on the brief for amici curiae Office of Communication of the United Church of Christ and Telecommunications Research and Action Center, urging affirmance.

Before WRIGHT and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Waters Broadcasting Corporation and West Michigan Broadcasting Company filed mutually exclusive applications with the Federal Communications Commission for a construction permit to establish a new FM radio station in Hart, Michigan. After conducting a hearing on which of the proposals would, on a comparative basis, best serve the public interest, an administrative law judge granted Waters' application.[1] West Michigan appealed, and the Review Board reversed the ALJ and granted West Michigan's application.[2] The case was then appealed to the full Commission which reversed the Review Board and granted Waters' application.[3] West Michigan now appeals to this court, arguing issues of both administrative and constitutional law. We affirm the Commission's decision in all respects.

In this case, under the criteria of the Commission's comparative evaluation process, both applicants were judged to be highly qualified. The competition was consistently viewed as a very close one. It was thus a case that forced the decisionmakers to examine with particularity the contours of the various factors that the Commission has traditionally used in evaluating comparative applications. That different results were reached at different stages of decision seems to reflect that at each level the various factors were re-examined and more precisely defined.

West Michigan is a corporation owned by three residents of Hart, Michigan, the community of license. Waters is a corporation owned by one resident of Muskegon, Michi-

---

1. Two other entities, Alpine Broadcasting Company and HJR Communications, Inc., had initially filed applications but had withdrawn from the competition prior to any hearing. *Alpine Broadcasting Co.*, 88 FCC2d 1213, 1214 n. 1 (1981) (decision of ALJ).

2. *Waters Broadcasting Corp.*, 88 FCC2d 1204 (Rev.Bd.1981).

3. *Waters Broadcasting Corp.*, 91 FCC2d 1260 (1982).

gan, located about 30 miles from Hart. Waters' owner made a commitment to move to Hart if her application was granted. Relevant differences between the applications boil down to the following: The Commission awarded West Michigan's proposal to integrate its ownership and management a "substantial enhancement" for its owners' residence and civic activities in the community of license. In contrast, Waters' integration proposal received a "substantial enhancement" because Waters was owned by a black and a "moderate enhancement" because its owner lived within the service area of the proposed station—though not in the community of license itself—and was active in her community's civic affairs. The essence of West Michigan's challenge is that its "substantial enhancement" for local residence and civic activities should have been sufficient to merit award of the permit.

As a matter of administrative law West Michigan challenges the way in which these "enhancements" were used by the Commission.[4] First, it challenges the "enhancement" given to Waters' integration proposal for its owner's residence and community involvement in Muskegon. It argues that granting an enhancement for res-

idence and community involvement in an area so distant from the community of license represents an arbitrary and capricious reversal of prior FCC policy. Second, West Michigan challenges the Commission's use of its "minority enhancement" in this case.

In the face of an extreme underrepresentation of minorities in the ownership and management of broadcast media enterprises the Commission has followed policies of promoting minority ownership and management. Because Waters is wholly owned by a black who will have full management responsibility for the station, the Commission granted a "substantial enhancement" to its application. West Michigan argues that, as a matter of both administrative and constitutional law, the FCC was wrong to grant such an enhancement where the community of license (*i.e.*, Hart, Michigan) contains no significant black population.[5]

## I. THE PROCESS OF COMPARATIVE EVALUATION

Because the issues in this case all derive from the nature of the Commission's comparative evaluation process, we will first discuss the goals and structure of that process. The nature of the process as a

---

4. Enhancements were also granted to both applicants on the basis of the owners' gender. Waters, whose only owner is a woman, received a more substantial enhancement for female ownership than did West Michigan. Only one of West Michigan's three owners is a woman, and that owner's interest amounted to only 24%. This was a factor in the Commission's decision in Waters' favor, *see* 91 FCC2d at 1266–1267, but West Michigan does not here challenge this FCC enhancement.

5. The extreme underrepresentation of minorities in the ownership of mass media broadcast facilities has been exhaustively documented and no party here questions it. At the time of the FCC decision in this case Congress had recently passed legislation pursuant to a finding that "the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the media of mass communications." H.R.Conf. Rep. No. 97–765, 97th Cong., 2d Sess. 43 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2287. The conference report had noted that a December 1981 survey by the National Associa-

tion of Broadcasters revealed that of the 8,748 commercial broadcast stations in the nation less than 2% were minority-owned and that of the 1,386 noncommercial stations only slightly more than 2% were minority-owned. *Id.* at 43–44. Previous survey results referred to by the FCC and the courts had revealed even more acute underrepresentation. *See, e.g., Statement of Policy on Minority Ownership of Broadcasting Facilities,* 68 FCC2d 979, 981 (1978) ("Despite the fact that minorities constitute approximately 20 percent of the population, they control fewer than *one percent* of the 8,500 commercial radio and television stations currently operated in this country." (*quoting* FCC MINORITY OWNERSHIP TASKFORCE, MINORITY OWNERSHIP IN BROADCASTING (1978)) (emphasis in original); *TV 9, Inc. v. FCC,* 495 F.2d 929, 937 n. 28 (D.C.Cir.1973) (In 1971, "'of the approximate 7,500 radio stations throughout the country, only 10 [were] owned by minorities. Of the more than 1,000 television stations, none [was] owned by minorities.'") (*quoting* UNITED STATES COMMISSION ON CIVIL RIGHTS, FEDERAL CIVIL RIGHTS ENFORCEMENT EFFORT 280 (1971)), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

whole will become an important factor in our analysis.

## A. The General Framework of the 1965 Policy Statement

The general evaluative framework that the Commission uses in its comparative process was first set out in its *Policy Statement on Comparative Broadcast Hearings*, 1 FCC2d 393 (1965) (hereinafter *Policy Statement*). In the *Policy Statement* the FCC stated that the process of comparison was designed to attain two general policy objectives:. "the best practicable service to the public" and "a maximum diffusion of control of the media of mass communications." 1 FCC2d at 394. Although stated separately, the Commission made clear that the two objectives were closely related: "Since independence and individuality of approach are elements of rendering good program service, the primary goals of good service and diversification of control are * * * fully compatible." *Id.* It also made clear that this relatedness rested on the view that our society benefits from exposure to a broad diversity of ideas and perspectives, a view of the public interest that it derived in large part from the Supreme Court's First Amendment jurisprudence: .

> As the Supreme Court has stated, the first amendment to the Constitution of the United States "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." * * *

*Id.* at 394 n. 4 (*quoting Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)); *see TV 9, Inc. v. FCC*, 495 F.2d 929, 937 (D.C.Cir. 1973), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974). *See also FCC v. Nat'l Citizens Committee for Broadcasting*, 436 U.S. 775, 794–797, 98 S.Ct. 2096, 2111–2113, 56 L.Ed.2d 697 (1978) (discussing relationship between the FCC goal of diversification of ownership and the First Amendment concern for promoting diversity of viewpoint); *Citizens Commu-*

*nications Center v. FCC*, 447 F.2d 1201, 1213 n. 36 (D.C.Cir.1971) (same). *See generally* Special Project, *Media and the First Amendment in a Free Society*, 60 Geo.L.J. 871, 1006–1014 (1972).

After discussing its policy goals, the statement focused on how six specific factors related to those goals and how each would be considered in future comparative proceedings. Although most of these factors have been discussed in detail in subsequent cases, they will all be briefly outlined here. Although the contentions of West Michigan focus on the second factor—participation in station affairs by station owners—we will here briefly outline all six of the factors so that the process can be understood as a whole.

1. *Diversification of control of the media of mass communication.* The Commission deemed it to be relevant whether an applicant's owners have ownership interests in other broadcast stations and other media of mass communication. To increase diversification of control and thus, presumably, "independence and individuality of approach," credit is given to entities controlled by those with few or no interests in other mass media entities. 1 FCC2d at 394–395.

2. *Full-time participation in station operation by owners.* The Commission considered integration of ownership with management to be a factor "of substantial importance." It was viewed as highly relevant to providing the "best practicable service" as well as complementing the diversification goals. The greater the degree of integration of ownership and management, the easier it is to focus on those responsible for station operations. Similarly, integration of ownership with management makes it more likely that diversification of ownership will result in diversification of control.

The Commission's consideration of ownership participation, however, goes beyond the "quantitative" issue of how extensive owner participation in management will be. If an owner actually exercises day-to-day control over the enterprise, it becomes reasonable to evaluate an application in terms

of the individual attributes of the owner. Such factors "as * * * [a participating owner's prior broadcast] experience and local residence," are thus considered under this category as "qualitative enhancements" to an application's proposal regarding its integration of ownership with management. *Id.* at 395–396. Most of the questions at issue in this case concern the FCC's use of "qualitative enhancements."

3. *Proposed program service.* Exceptional programming proposals are considered relevant. But because the Commission recognized the difficulty of making prospective comparative evaluations, "[d]ecisional significance [is] accorded only to material and substantial differences between applicants' proposed program plans." Minor differences are thus not considered relevant. *Id.* at 397–398.

4. *Past broadcast record.* Unusually good or bad prior behavior of a broadcast owner is considered relevant, but a past broadcast record of average quality is not considered relevant. *Id.* at 398.

5. *Efficient use of frequency.* Proposals are given merit if for engineering reasons they would be more efficient than would competing applicants' proposals. *Id.* at 398–399.

6. *Character.* A significant character deficiency would be considered reason for disqualification or demerit. Otherwise character evidence is not considered relevant. *Id.* at 399.

In addition, the Commission stated that enumeration of six specific factors in the *Policy Statement* was "not intended to preclude the full examination of any relevant and substantial factor." *Id.* Where significance could be shown, other factors might be considered.

In this case few of the stated factors established clear distinctions between Waters and West Michigan. Neither applicant alleged any character deficiencies in the other, nor did either propose a more efficient use of the frequency than the other. None of the owners had any prior broadcast record or experience, nor did either entity propose any unique program service. More important, none of the owners of either party had any controlling, or less than controlling, interests in any other broadcast stations or other media of mass communication,[6] and both entities submitted integration proposals that provided for 100 percent participation in station operation by their owners.[7]

Faced with this substantial equality between the two applicants, the outcome became dependent on the particular attributes of the owners of each applicant. As the Review Board wrote, "[T]he only basis for decision provided on this record is nar-

---

6. West Michigan does contend that Waters' owner should be treated as having an interest in other broadcast facilities through her husband. Mrs. Nancy Waters, owner of Waters Broadcasting Corporation, is married to Mr. James Waters, a publicly elected member of the Board of Regents of the University of Michigan. The Board of Regents, an eight-member body, is the licensee of four noncommercial broadcast stations. At every administrative level West Michigan's argument was rejected. The issue was discussed in the greatest detail by the ALJ:

There is no evidence * * * that Mr. Waters' relationship with the University of Michigan stations creates a mutual or successive right in Mrs. Waters. * * * He cannot exercise his interest beyond his term of office; his interest is not financial or beneficial; he does not participate in the stations' operations; and the interest he holds can neither be delegated to nor succeeded to by his wife. Moreover, * * Mrs. Waters' interest in the application here is independent of Mr. Waters. She has indepen-

dent financial resources * * * [and] has provided a long list of activities she has undertaken independent of Mr. Waters.

88 FCC2d at 1218. This analysis was adopted by the Review Board, *see* 88 FCC2d at 1206, and by the Commission, *see* 91 FCC2d at 1265. The two applicants were thus treated as equal with respect to diversification of control. We find this entirely reasonable.

7. The ALJ had given Waters' proposal for quantitative integration of ownership with management slightly more credit than he gave West Michigan's because he doubted West Michigan's owners' ability to operate with three managers. *See* 88 FCC2d at 1219–1220. His decision was overturned by the Review Board, *see* 88 FCC2d at 1207–1208, and this was affirmed by the Commission, which thus treated the two applicants as equal with respect to quantitative integration. *See* 91 FCC2d at 1266.

row—the qualitative integration enhancements of the participating owners." *Waters Broadcasting Corp.*, 88 FCC2d 1204, 1211 (Rev.Bd.1981).

The *Policy Statement* concentrates on two "qualitative" factors that could enhance the application of a fully participating owner: broadcast experience and local residence. Although neither side claimed enhancement for broadcast experience, the core of West Michigan's challenge is that the local residence of its owners should have mandated an outcome in its favor.

B. *"Qualitative Enhancement" for Integration of Local Ownership With Management*

The *Policy Statement* explains the rationale for crediting local residence in terms of the need to provide "a broadcast service which meets the needs of the public in the area to be served, both in terms of those general interests which all areas have in common and those special interests which areas do not share. An important element of such a service is the flexibility to change as local needs and interests change." 1 FCC2d at 394. Thus, "[p]articipation in station affairs * * * by a local resident indicates a likelihood of continuing knowledge of changing local interests and needs." *Id.* at 396. Moreover, "[p]ast participation in civic affairs [is thus] considered as a part of a participating owner's local residence background, as [are] any other local activities indicating a knowledge of and interest in the welfare of the community." *Id.*

As a result of this policy the Commission credited West Michigan's application with a "substantial enhancement" based on its owners' local residence and their histories of local community involvement. But the Commission also granted Waters' application a "moderate enhancement" because its owner was a resident of Muskegon, a town 30 miles from Hart and in an adjacent county, and because that owner had an extensive history of civic involvement in that community. The FCC based this grant on the *Policy Statement*, which said, "Generally speaking, residence in the principal community to be served will be of primary importance, closely followed by residence outside the community, but within the proposed service area." *Id.* West Michigan argues that this was arbitrary and capricious in light of a consistent FCC practice of awarding no credit for community involvement outside the community of license.

C. *Qualitative Enhancement for Integration of Minority Ownership With Management*

The *Policy Statement* was intended to provide, and has provided, a general guide for FCC decisionmaking, but it was not intended to be an inflexible last word.[8] The statement has been subject to elaboration in case-by-case adjudication through which the Commission has incorporated various considerations whose importance to the FCC's "public interest" mandate have only become fully recognized since the *Policy Statement*'s issuance.[9] The most

---

8. In the introductory paragraphs of the *Policy Statement* the FCC describes the statement's goals as to provide "a high degree of consistency of decision and of clarity in our basic policies" and to "general[ly] review * * * the criteria governing the disposition of comparative broadcast hearings." 1 FCC2d at 393. But the statement emphasized that "the subject [of comparative evaluation] does not lend itself to precise categorization or to the clear making of precedent," and that "membership on the Commission is not static and the views of individual Commissioners on the importance of particular factors may change. * * * [C]hanges of viewpoint, if reasonable, are recognized as both inescapable and proper." *Id.*

9. This was wholly consistent with what the FCC said in the *Policy Statement*:

> [B]y this attempt to clarify our present policy and our views with respect to the various factors which are considered in comparative hearings, we do not intend to stultify the continuing process of reviewing our judgment on these matters. Where changes in policy are deemed appropriate they will be made, either in individual cases or in further general statements, with an explanation of the reason for the change.

> 1 FCC2d at 399; *see also* note 8 *supra*.

prominent of such considerations, particularly significant to this case, is the minority status of an applicant's owner who will fully participate in station management.

Although the Commission did not have minority broadcast ownership promotion policies at the time of the *Policy Statement,* over the past decade the courts, the Commission, and the Congress have all concluded that promotion of minority owned broadcast media facilities, where the minority owner will be fully involved in broadcast management, is an important public policy objective within the FCC's "public interest" mandate. *See, e.g., Garrett v. FCC,* 513 F.2d 1056 (D.C.Cir.1975); *TV 9, Inc. v. FCC, supra,* 495 F.2d 929; *Statement of Policy on Minority Ownership of Broadcasting Facilities,* 68 FCC2d 979 (1978); *WPIX, Inc.,* 68 FCC2d 381, 410–412 (1978); Communications Amendments Act of 1982, Pub.L. No. 97–259, 96 STAT. 1087, 1094–1095 *(codified at 47 U.S.C. § 309(i)(3)(A) and (C)(ii)* (requiring that minority ownership program be incorporated into any lottery scheme developed by FCC as means of choosing from among mutually exclusive applicants); H.R.Conf.Rep. No. 97–765, 97th Cong., 2d Sess. 40–41, 43–46 (1982) (discussing and endorsing minority ownership program and explaining new statutory requirement that, if comparative hearing scheme is replaced with a lottery, minority ownership program be incorporated into any future lottery scheme). *See also* FCC MINORITY OWNERSHIP TASKFORCE, MINORITY OWNERSHIP IN BROADCASTING (1978); FEDERAL COMMUNICATIONS COMMISSION, MINORITY OWNERSHIP OF BROADCAST FACILITIES: A REPORT (1979); *Mid-Florida Television Corp.,* 37 FCC2d 559, 560 (1972) (concurring statement of Commissioner Hooks). Such minority ownership promotion policies have subsequently been developed in a variety of fields of FCC practice, *see, e.g., Statement of Policy on Minority Ownership of Broadcast Facilities, supra,* and in the comparative broadcast hearing context the policy goal has been incorporated into the *Policy Statement*'s framework. *See WPIX, Inc., supra,* 68 FCC2d at 411–412 (minority ownership, if accompanied by owner participation in station affairs, is to be treated as a qualitative enhancement under the integration of ownership with management criterion).

In this case Waters was granted a "substantial enhancement" based on the fact that Waters is an enterprise fully owned by a black who would be fully responsible for its day-to-day management. West Michigan challenges that grant.

## II.   ANALYSIS OF WEST MICHIGAN'S CONTENTIONS

### A.   *West Michigan's Nonconstitutional Theories*

1.  *West Michigan's challenge to the FCC's award of a "moderate enhancement" for Waters' owner's residence and community involvement in Muskegon.*

■ West Michigan has argued that Waters is entitled to no enhancement for its owner's residence and community activity in Muskegon, Michigan. Muskegon is not the community of license of the proposed station, and thus, West Michigan argues, residence and involvement there would not serve the *Policy Statement*'s goal of "indicat[ing] a likelihood of continuing knowledge of changing local interests and needs." 1 FCC2d at 396. This position was first rejected by the Review Board, which concluded that Waters' application was entitled to a "slight enhancement" for its owner's Muskegon residence and involvement, *see* 88 FCC2d at 1210, and on appeal it was rejected by the Commission, which awarded Waters' application "moderate enhancement." 91 FCC2d at 1262–1263.

West Michigan supports its interpretation of the *Policy Statement* by citing a number of Review Board opinions that refused to grant enhancement for community involvement outside the community of license. *See, e.g., "What the Bible Says," Inc.,* 28 FCC2d 551, 556 (Rev.Bd.1971); *Community Broadcasting Co.,* 60 FCC2d 951, 953 (Rev.Bd.1976). It further argues

that its proffered construction conforms to the FCC's longstanding position that "a licensee's 'primary service area' is its community of license, and a 'licensee's prime and most important focus must be on the problems, needs and interests of its community of license.'" Brief for appellant at 44 (*quoting WHYY, Inc.*, 93 FCC2d 1086, 1096 (1983)). But while it is true that the cases cited by West Michigan *do* show that the FCC's current position is contrary to certain prior cases, and it also seems true that the interpretation offered by West Michigan is consistent with cases that emphasize the primary importance of a licensee's duty to serve the community of license, neither of these points merits overturning the position of the Commission.

The fact that prior cases support West Michigan's analysis clearly cannot be determinative. "[A]n agency's view of what is in the public interest may change, with or without a change in circumstances." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). This court has only required that changes in policies through case-by-case adjudication—if consistent with statutory and constitutional principles—must be accompanied by "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Id.*

In this case the Review Board and the Commission clearly knew they were deviating from prior cases; indeed they cited those cases and stated that their current position was a change in policy. Although their discussions were not lengthy, they did give reasons for their views. The Commission, for example, recalled the 1965 *Policy Statement*'s position on local residence outside of the community of license: Although "residence in the principal community to be served [was to] be of primary importance, [it was to be] closely followed by residence outside the community, but within the proposed service area." 91 FCC2d at 1263 (*quoting Policy Statement*, 1 FCC2d at 396). The Commission then admitted that "some previous Commission

cases have indicated that civic activities outside of the principal community are 'not meaningful in relationship to service to the proposed community,'" 91 FCC2d at 1263 n. 10 (*quoting "What the Bible Says," Inc., supra*, 28 FCC2d at 556), but it concluded that "civic activities indicate a knowledge of and interest in the welfare of the community, and * * * thus * * * 'it would be more consistent with the Policy Statement to treat civic participation in the same manner as local residence.'" 91 FCC2d at 1263 n. 10 (*quoting* 88 FCC2d at 1210 (Review Board decision)). There is nothing unreasoned about this explanation.

Nor is the Commission's position in this case inconsistent with those cases that discuss the primary importance of a licensee's duty of service to the community of license. *See, e.g., WHYY, Inc., supra*. Waters was given only a "moderate enhancement" for its owner's residence and involvement in Muskegon, while West Michigan was given a "substantial enhancement" for its similar status in Hart. This would seem entirely consistent with the policy of primarily focusing on service to the community of license. Cases like *WHYY* offer no support to a contention that residence and community involvement outside of the community of license but within the proposed service area must be held irrelevant to FCC comparative hearings. *See WHYY*, 93 FCC2d at 1096 ("[W]hile the station's primary obligation is to serve the needs of its city of license, [it] also has a *secondary* duty to serve other nearby areas * * *.") (emphasis in original).

For these reasons we have no difficulty rejecting West Michigan's challenge regarding the Commission's treatment of Waters' owner's residence and community involvement.

2. *West Michigan's challenge to the FCC's award of a "substantial enhancement" for Waters' ownership by a black who will fully participate in station management.*

■ West Michigan's challenges to the Commission's reliance on its minority own-

ership promotion policies in this case involve both nonconstitutional and constitutional issues. This section will deal with the nonconstitutional issues.

West Michigan has consistently argued to the FCC that the policy supporting grant of enhancements for minority ownership rests on the policy of giving minority populations in a local community access to the broadcast spectrum. An enhancement for Waters would thus be inappropriate because Hart, Michigan has no significant black population. West Michigan argues that, by trying to promote black ownership in a community containing few blacks, the Commission divorced the enhancement for minority ownership from its original justification, to give voice to local minority populations not yet represented in the local broadcast media. It then argues that such a move is arbitrary and would rob the minority enhancement of any legitimate statutory purpose. The only legitimate reason to promote minority ownership, in West Michigan's view, is to provide programming responsive to a local minority population. Only then, it argues, is promoting minority ownership consistent with the Commission's statutory mandate of serving the interests of the listening public. Without a nexus between the minority status of a broadcast applicant's owner and the minority population in a local community, it argues, "there is no reason to expect that * * * race will produce any identifiable benefit for * * * program service." Brief for appellant at 17.

The FCC explicitly rejected this argument and has instead asserted that its policy is to promote minority ownership, whenever that ownership is integrated with management, regardless of whether the local community has a black population of any particular size. 91 FCC2d at 1264–1265. The Commission's position is, in effect, an attack on the premises of West Michigan's argument. The Commission argues that its minority ownership promotion policies have never been exclusively premised on the goal of providing particular minority audiences with minority broadcasters responsive to their needs. To the contrary, the Commission argues that the principal premise of the policies has been that it is generally desirable to provide the listening audience as a whole with programming choices that reflect a diversity of viewpoints and perspectives. Because of the extreme underrepresentation of minorities among the nation's broadcasters, minority perspectives are conspicuously absent from the broadcast media. Promoting minority ownership, if linked to minority management, is desirable as a way of increasing the overall diversity of perspectives represented in the broadcast mass media. The FCC has thus developed a policy of awarding "qualitative enhancements" to minority-owned applicants where those minority owners will be full participants in station management. On that basis Waters received a substantial enhancement.

West Michigan argues that this FCC position is inconsistent with past FCC policy and with the FCC's statutory authorization, and cites as its principal source of support the opinion of this court in *TV 9, Inc. v. FCC, supra,* 495 F.2d 929. We must reject, however, the argument that that case can support reversing the FCC's policies as put forth in this case. Indeed, the underlying logic of *TV 9* is consistent with the policies the Commission has adopted.

a. *The* TV 9 *opinion.*

In *TV 9* this court reviewed and set aside the results of an FCC comparative broadcast hearing in which the Commission had held that minority ownership of an applicant, by itself, could not be a relevant consideration under the 1965 *Policy Statement.* The FCC had simply stated that the "Communications Act * * * is color blind" and only a showing that an applicant's owner's particular "experience, background, and knowledge of the community" would result in superior service could be considered in a comparative hearing. *See* 495 F.2d at 936 (*quoting Mid-Florida Television Corp.,* 33 FCC2d 1, 17–18 (1972)). This court, in an opinion by Judge Fahy, rejected this analysis.

Judge Fahy's opinion first reminded the Commission that the *Policy Statement*, in setting forth various goals relating to the agency's public interest mandate and in itemizing the various factors it would use to evaluate applicants with respect to those goals, did not intend "to preclude the full examination of any relevant and substantial factor." 495 F.2d at 937 (*quoting Policy Statement, supra*, 1 FCC2d at 399). This was the *Policy Statement*'s recognition that "the Act itself, and not the Policy Statement, is the Commission's basic charter." 495 F.2d at 942 (supplemental opinion). The opinion then adverted to the FCC's public interest goal of providing the "diversity of ideas and expression required by the First Amendment," and the connection between that interest and the long-standing FCC policy of promoting diversity of ownership. *Id.* at 937, *citing Citizens Communications Center v. FCC, supra*, 447 F.2d at 1213 n. 36.[10] This court had previously said that, pursuant to the public interest in diversity of ideas, "[a]s new interest groups and hitherto silent minorities emerge in our society, they should be given some stake in and chance to broadcast on our radio and television frequencies." *Citizens Communications Center, supra*, 447 F.2d at 1213 n. 36, *quoted at* 495 F.2d at 937. Based on these considerations and on the extreme underrepresentation of minorities in media ownership, *TV 9* held that "when minority ownership is likely to increase diversity of content, especially of opinion and viewpoint, merit should be awarded." 495 F.2d at 938.

In response to the arguments that the race of an applicant's owner was not relevant because a nonminority owner might adequately present a minority's views, *TV 9* recalled "that it is upon ownership that public policy places primary reliance with respect to diversification of content, and that historically has proven to be significantly influential with respect to editorial comment and the presentation of news." *Id.* Similarly, *TV 9* rejected the argument that a particular minority owner who will participate in management should also have to show "[in] advance [an] assurance of superior community service attributable to such Black ownership and participation[.]" The opinion pointed out that such "an assurance [is] not required, for example, for favorable consideration of local residence, accompanied with participation, on the issue of integration of ownership with management. Reasonable expectation, not advance demonstration, is a basis for merit to be accorded relevant factors." *Id.* One of the principal rationales of *TV 9* was therefore that, given the extreme underrepresentation of minorities in ownership of the broadcast mass media,[11] the rationale of promoting program diversity—a rationale that is derived from the First Amendment and at the heart of the Communications Act—supports granting positive weight to minority ownership as a factor in comparative broadcast hearings where that ownership is accompanied by participation in station affairs.

West Michigan focuses its attention on a different aspect of *TV 9:* the court's discussion of the sizable black population in the community of license and of that population's presumed interest in programming that might be responsive to its particular concerns. In one sense West Michigan is correct: In *TV 9*, unlike this case, the community of license contained a sizable black population, and the court noted that fact as well as the fact that the community contained no other black-owned broadcast facility. 495 F.2d at 935, 937 nn. 26 & 28. But even if we read *TV 9* in the light most favorable to West Michigan's position, its holding would simply rest on two principles: promotion of "broader community representation," *i.e.*, meeting the particular needs of a substantial black community with theretofore unmet needs, and promo-

---

**10.** As we discussed above, the goal of promoting diversity of programming has long been considered an essential aspect of the FCC's public interest mandate and was recognized in the FCC's *Policy Statement*.

**11.** *See* note 5 *supra*.

tion of the best "practicable service to the public by increasing the diversity of content, especially of opinion and viewpoint." 495 F.2d at 941 (supplemental opinion). Nothing in the opinion implies that the court was trying to define precisely or limit the manner in which the FCC could consider minority status and incorporate it into its public interest determination. The opinion certainly has no implication that the FCC was to be limited in any future consideration of race to those cases where both principles would have application. To the contrary, the opinion clearly recognized that the goal of "increasing diversity of content, especially of opinion and viewpoint," *id.*, whether for a locality or for the nation as a whole, was a vital part of the FCC's public interest mandate.[12] It is equally clear that the *TV 9* court believed that that goal made generally legitimate the FCC's granting of positive consideration to proposals for involvement in station management of a broadcast owner who is a member of an ethnic minority that had been excluded from and remains extremely underrepresented within the nation's broadcast media. *See generally id.* at 936–938, 941–942.

### b. *Prior FCC policy.*

In addition to arguing that the Commission's award in this case is beyond its statutory authority and inconsistent with this circuit's prior case law—arguments we have rejected above—West Michigan argues that it is inconsistent with the Commission's own prior policy with respect to minority ownership. We must similarly reject this contention. Although West Michigan cites a large number of cases in which enhancements for minority ownership were awarded to applicants seeking to serve communities of license that contained substantial minority populations, it can cite no cases in which an enhancement was denied because the local population contained few

minorities. Indeed, the Commission opinion in this case cites a prior case in which an enhancement was awarded without regard to any local minority population's special interests, 91 FCC2d at 1265–1266 & n. 16, *citing Radio Gaithersburg*, 72 FCC2d 820 (Rev.Bd.1979), and thus refutes West Michigan's assertion that its action was in conflict with prior precedent.

But even if there had been no prior case awarding an enhancement without regard to the minority makeup of the local population, West Michigan's contention would be wholly without merit. Such a situation would mean little more than that this case presents a new issue on which the Commission has taken a reasonable, well explained position.

### c. *Related FCC policies.*

West Michigan's position in this case is, in essence, a contention that the Commission's previously adopted vision of the public's interest in minority ownership promotion can give no support to promotion of minority ownership in communities containing insubstantial minority populations. That position, however, wholly ignores the vision that stands behind a variety of FCC minority ownership programs pursued in areas of broadcast regulation other than comparative evaluation. The conception of the public interest which the FCC pursues through the comparative evaluation process is not necessarily different from that which it pursues through many other aspects of FCC broadcast regulation. The Commission may certainly, as it has done in this case,[13] look to the programs it has adopted in related regulations, note the conception of the public interest embodied in those programs, and act to harmonize its positions.

The minority enhancement used in the FCC's comparative broadcast hearings is part of a broader FCC minority ownership

12. Judge Fahy discussed the issue of minority ownership in both local and national terms. For example, he cites statistics to show the national underrepresentation of minorities at 495 F.2d at 937 n. 28.

13. *See* 91 FCC2d at 1265 n. 16.

promotion policy. In the decade since *TV 9* the Commission has, for example, developed a program of granting tax certificates to broadcasters selling stations to minorities [14] and another program excepting broadcast station sales to minorities from the general prohibition on broadcast station "distress sales." [15] Both programs operate to give minorities seeking media ownership an advantage over nonminorities seeking media ownership, *and both operate without regard to the size or existence of a minority population in the community of license.*

It is true that in explaining its adoption of these programs the FCC discussed the need to furnish programming that would be responsive to the unmet listening needs of minority communities. But this was only a part of its explanation. The Commission clearly saw the policy underlying the promotion of minority media ownership as containing a significant element wholly unrelated to the specific needs of any particular minority community.

> [W]e are compelled to observe that the views of racial minorities continue to be inadequately represented in the broadcast media. This situation is detrimental not only to the minority audience but to all of the viewing and listening public. Adequate representation of minority viewpoints in programming serves not only the needs and interests of the minority community but also enriches and educates the non-minority audience. It enhances the diversified programming which is a key objective not only of the Communications Act of 1934 but also of the First Amendment.

Thus, * * * it appears that additional measures are necessary and appropriate. In this regard, the Commission believes that ownership of broadcast facilities by minorities is [a] significant way of fostering the inclusion of minority views in the area of programming.

> *      *      *      *      *      *

> It is apparent that there is a dearth of minority ownership in the broadcast industry. Full minority participation in the ownership and management of broadcast facilities results in a more diverse selection of programming. * �startᵉ * What is more, affecting programming by means of increased minority ownership * * * avoids direct government intrusion into programming decisions.

*Statement of Policy on Minority Ownership of Broadcast Facilities, supra,* 68 FCC2d at 980–981 (footnotes omitted).

Given these FCC programs and the reasoning that the FCC has offered to explain them, it is clear that the Commission's position in this case, and the conception of the public interest it embodies, is wholly consistent with the overall policies it has pursued.

### d. *Congressional approval.*

Congress has remained well aware of the Commission's minority ownership promotion programs. Indeed, Congress itself has passed recent legislation, cited in the FCC's decision,[16] that explicitly mandated that the FCC follow a minority ownership promotion program that would clearly rest on the very view of the public interest that the Commission has here followed and that West Michigan argues it was compelled to reject. *See* Communications Amendments

---

**14.** Under 26 U.S.C. § 1071 (1982), the FCC can permit sellers of broadcast properties to defer capital gains taxation on a sale whenever it is deemed "necessary or appropriate to effectuate a change in policy of, or the adoption of a new policy by, the Commission with respect to the ownership and control of radio broadcast stations." For the Commission's decision to grant tax certificates when stations are sold to minority-controlled enterprises, see *Statement of Policy on Minority Ownership of Broadcasting Facilities, supra* note 5, 68 FCC2d at 982–983.

**15.** "Distress sales" are sales by licensees whose licenses have been designated for revocation hearing or whose renewal applications have been designated for hearing on basic qualification issues. For the policy with respect to distress sales to minorities, *see id.* at 983.

**16.** *See* 91 FCC2d at 1264 n. 13.

Act of 1982, Pub.L. No. 97–259, 96 STAT. 1087, 1094–1095 (*codified at* 47 U.S.C. § 309(i)(3)(A) and (C)(ii)); *see also* H.R. Conf.Rep. No. 97–765, 97th Cong., 2d Sess. 40–41, 43–46 (1982). This legislation was designed to facilitate the development of a random lottery system as an alternative to the FCC's currently used but much criticized comparative evaluation process. It explicitly requires that significant preferences for minority applicants, to advantage them over otherwise similar nonminority applicants, be incorporated into any random selection licensing scheme. Its requirement contains no reference to the size or existence of a minority population in the community of license.

By enacting legislation to require the Commission to formulate an additional minority ownership promotion program which, like the policy at issue here, would operate regardless of the racial makeup of the community of license, Congress made clear its approval of the Commission's policy.[17] Such "evidence of Congressional approval * * * goes well beyond [the implication of legislative acquiescence from] the failure of Congress to act * * *. Congress affirmatively manifested its acquiescence in the [Commission's] policy * * *." *Bob Jones University v. United States*, 461 U.S. 574, ——, 103 S.Ct. 2017, 2034, 76 L.Ed.2d 157 (1983).

### B. *Constitutional Theory*

The last issue in this case is West Michigan's assertion that the FCC's use of an enhancement for minority status in this case violates constitutional equal protection principles. The contention confronts us with a difficult and controversial area of constitutional law—the validity of efforts to remedy past racial discrimination through government-sponsored "affirmative action" plans. In analyzing West Michigan's theory we look to the Supreme Court's two decisions in this area, *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), and *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

While it is true that neither *Fullilove* nor *Bakke* produced a majority opinion for the Court—and thus that the law is particularly complicated—this case does not require a detailed or lengthy inquiry into the exact contours of the approaches taken in the numerous separate opinions in those cases. To the contrary, we find that a number of factors show that the FCC's plan easily passes constitutional muster in light of the various *Bakke* and *Fullilove* approaches.[18]

In our analysis two factors stand out as particularly important to our conviction that there is no constitutional infirmity in the FCC's behavior. First, the Commission's award of minority enhancements is not a grant of any given number of permits to minorities or a denial to qualified nonminorities of the ability freely to compete for permits; it is instead a consideration of minority status as but *one factor* in a competitive multi-factor selection system that is designed to obtain a diverse mix of broadcasters. Second, the Commission's action in this case came on the heels of highly relevant congressional action that showed clear recognition of the extreme underrepresentation of minorities and their perspectives in the broadcast mass media. Congress found that this situation was a

---

17. The enactment was intended to assure that the FCC's minority ownership policies would not be abandoned if the comparative evaluation process of which they were a part was abandoned. The conference report contains an extensive discussion of the public interest rationale behind minority ownership promotion, and that diversity of viewpoint rationale is the same as that voiced by the Commission in this case. *See* H.R.Conf.Rep. No. 97–765, *supra* note 5, at 43–45.

18. For cases examining a variety of government affirmative action programs in light of the rationales of the various opinions in *Bakke* and *Fullilove, see South Florida Chapter of Associated General Contractors v. Metropolitan Dade County,* 723 F.2d 846 (11th Cir.1984); *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir. 1983); *Schmidt v. Oakland Unified School District,* 662 F.2d 550 (9th Cir.1981), *vacated and remanded on other grounds,* 457 U.S. 594, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982); *M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D.Tenn.1981).

part of "the effects of past inequities stemming from racial and ethnic discrimination." H.R.Conf.Rep. No. 97–765, 97th Cong., 2d Sess. 43 (1982), U.S.Code Cong. & Admin.News 1982, p. 2287. Congress must be understood to have viewed the sort of enhancement used here as a valid remedial measure. In giving special weight to these factors we in no way imply that either would be essential to the constitutionality of a government affirmative action program, but their presence places the program's constitutionality beyond question.

In the well known *Bakke* case five Justices reached the constitutional issues presented by Bakke's challenge to a state medical school's affirmative action program. The rationale of four Justices (Brennan, White, Marshall, and Blackmun) [19] would clearly uphold the FCC's program. Briefly, under the approach of these Justices government can legitimately pursue race-conscious programs to remedy a situation of "substantial and chronic" minority underrepresentation resulting from "past societal discrimination." 438 U.S. at 362, 98 S.Ct. at 2784. The statistics cited concerning the underrepresentation of racial minorities in the medical profession were no more severe than those concerning the situation in broadcast mass media ownership.[20]

Justice Powell, the only other Justice to reach the constitutional issue, would not have allowed government to so freely justify a race-conscious program as remedial where the remedy is based on "unidentified" societal discrimination. *Id.* at 307–310, 98 S.Ct. at 2757–2758. But he nevertheless agreed that race can at times validly be a factor in government selection procedures.

The FCC policy would clearly be validated under Justice Powell's approach, which had endorsed a rationale very similar to that offered here by the FCC. Justice Powell approved of educational institutions' use of race as one factor among many in efforts to attain diverse student bodies. Just as the FCC rests its goal of attaining diverse programming on the First Amendment value "that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public," [21] Justice Powell recognized that a state university could find support in the First Amendment for the goal of attaining a diverse student body in order to expose students to the "atmosphere of 'speculation, experiment and creation'—so essential to the quality of higher education—[that] is widely believed to be promoted by a diverse student body." [22] To this end the race of, for example, a black applicant could be a legitimate consideration in a school's admissions process if otherwise minorities would not be admitted in sufficient numbers "to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States." 438 U.S. at 323, 98 S.Ct. at 2765. *See generally id.* at 311–320, 98 S.Ct. at 2759–2763. Clearly, under Justice Powell's approach the FCC's goal of bringing minority perspectives to the nation's listening audiences would reflect a substantial government interest within the FCC's competence that could legitimize the use of race as a factor in evaluating permit applicants.

Justice Powell did not, however, see a university's creation of inflexible racial quotas that ignore all possible attributes of nonminority applicants as a legitimate means of attaining the best educational environment.

---

19. *See* 438 U.S. at 324, 98 S.Ct. at 2765 (opinion concurring in part and dissenting in part).

20. For statistics concerning minorities in the medical profession, see 438 U.S. at 369–370, 98 S.Ct. at 2788–2789. For statistics concerning minority broadcast ownership, see note 5 *supra*.

21. *Policy Statement on Comparative Broadcast Hearings,* 1 FCC2d 393, 394 n. 4 (1965) (*quoting*

*Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)).

22. 438 U.S. at 312, 98 S.Ct. at 2759; *see also id.* at 312–313, 98 S.Ct. at 2759–2760 (*quoting Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967)).

[R]ace or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important. In short, an admissions program operated in this way is flexible enough to consider qualifications of each applicant, and to place them on the same footing for consideration, although not necessary according them the same weight.

\* \* \* \* \* \*

This kind of program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment.

438 U.S. at 317–318, 98 S.Ct. at 2763–2764 (footnote omitted).

The FCC comparative evaluation process generally conforms to Justice Powell's model. As has been discussed above, it explicitly provides for examination of a wide variety of traits to assess an applicant's potential for increasing diversity and quality of programming. As one commissioner wrote, "In this case, \* \* \* race was no bar to West Michigan. It could \* \* \* have done more to show that it was comparatively superior to Waters—by proposing more efficient use, or some form of specialized programming, to name just two possibilities." 91 FCC2d at 1281 n. 37 (separate statement of Commissioner Rivera).[23]

Any doubt concerning the constitutionality of the FCC's consideration of minority status was ended by Congress' approval of the Commission's goals and means. In *Fullilove*, where the Court upheld the constitutionality of a congressional enactment requiring that a certain percentage of federal construction funds go to minority-owned enterprises, three Justices (Chief Justice Burger and Justices White and Powell) emphasized the importance of congressional action in the area of race-conscious remedial programs. That there had been action by Congress was found important both because of Congress' "broad remedial powers" derived from its express constitutional authority "to enforce equal protection guarantees," 448 U.S. at 483, 100 S.Ct. at 2777 (Burger, C.J.), and because of its competence to find as a factual matter the existence of past identifiable discrimination. *Id.* at 506, 100 S.Ct. at 2789 (Powell, J.).

Of relevance to this case is Congress' passage of Section 115 of the Communica-

---

**23.** For a discussion of the variety of factors that are considered by the Commission, and that might in a given case prove outcome-determinative, *see* Part I–A & B *supra*.

The approach to race endorsed by Justice Powell in *Bakke* closely mirrors Judge Fahy's use of race in *TV 9, Inc. v. FCC, supra* note 5. In that case Judge Fahy endorsed use of race as

a "plus factor" that, when weighed with other factors, could, but would not necessarily, result in a determination that a particular minority applicant had qualifications superior to those of a particular nonminority applicant. 495 F.2d at 941 n. 2 (supplemental opinion). This accurately describes the current FCC practice derived from *TV 9.*

tions Amendments Act of 1982, Pub.L. No. 97–259, 96 STAT. 1087, 1094–1095 (*codified at* 47 U.S.C. § 309(i)(3)(A) and (C)(ii)), which must be viewed as congressional approval of the FCC's minority ownership promotion policies.[24] Passage of the Act must similarly be viewed as giving congressional confirmation to the factual bases of those policies' remedial nature.

In particular, the conference report made clear that in Congress' view the "severe underrepresentation of minorities in the media of mass communications" had resulted from "past inequities stemming from racial and ethnic discrimination." H.R. Conf.Rep. No. 97–765, *supra*, at 43, U.S. Code Cong. & Admin.News 1982, p. 2287. It also made clear that Congress had explicitly found that the award of significant preferences to minority-controlled broadcast entities was an appropriate way of "remedying the past economic disadvantage to minorities which has limited their entry into various sectors of the economy, including the media of mass communications, while promoting the primary communications policy objective of achieving a greater diversification of the media of mass communications." *Id.* at 44. Under

*Fullilove* Congress can clearly adopt such race-conscious policies to assure that current allocations do not perpetuate race-based disparities derived from past discrimination. And an administrative agency can certainly follow Congress' lead in an effort to further implement Congress' concerns. *Cf. M.C. West, Inc. v. Lewis*, 522 F.Supp. 338 (M.D.Tenn.1981). That is what the FCC has done here.

### III. CONCLUSION

For the reasons stated in this opinion, we find that the FCC's use of a minority enhancement in this case was no violation of administrative or statutory law; nor was it a violation of our Constitution's equal protection principles. We therefore affirm the Commission in all respects.

*Affirmed.*

---

24. *See* discussion in Part II–A–2–d *supra*.